**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 17a0423n.06**

**No. 16-3107**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 20, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DAVID W. CARTER; OUR ALL AMERICAN RECYCLING CO., LTD, dba Red's All American Recycling Co.; ROBERT L. THOMSON, | ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| MONTE HAMAOUI; CITY OF ROCKY RIVER, OH; OHIO STATE HIGHWAY PATROL TROOPER JAMES BAKER, | ) ) ) ) | |
| Defendants-Appellees, | ) ) | |
| and | ) ) | |
| JOHN DOES 1–10, Defendants. | ) ) ) ) | |

BEFORE:     BOGGS, GILMAN, and DONALD, Circuit Judges.

**BOGGS, Circuit Judge.**  In August 2013, David Carter and Robert Thomson began a trip to Cleveland, Ohio, along Interstate 90 for the purpose of delivering a supply of various metal objects to a scrap-metal processor.  Unbeknownst to them, someone called in a tip to the police, informing officers that a flatbed truck matching the description of Carter's vehicle and towing a load of scrap aluminum cans was also transporting marijuana on I-90.  Rocky River Officer Monte Hamaoui received the tip, along with the advice from a state trooper to "make [his] own" probable cause.  [[R. 66, p. 998.]]  Hamaoui pulled Carter over for weaving, driving

too slowly, and travelling with an overweight vehicle. When a drug-sniffing dog alerted while circling the truck, officers searched the vehicle and later moved it to a service garage, where it was more thoroughly searched. No illegal drugs were found. The district court granted the defendants' motion for summary judgment on the grounds that there were no constitutional violations and the defendants were entitled to qualified immunity. Because the facts that Hamaoui observed had no substantial connection to a violation of Ohio's overweight-vehicle law and because Plaintiffs have demonstrated a genuine issue of material fact with regard to the other alleged sources of reasonable suspicion for pulling over Carter's truck, we reverse the district court in part. We affirm its decision in all other aspects.

I

On August 22, 2013, longtime friends David Carter and Robert Thomson met to haul material for Our All American Recycling Company, Ltd. ("All American"), from Lorain, Ohio, to Ferrous Processing and Trading Co., a scrap-metal processor with a receiving center in Cleveland. [[R. 61, pp. 289–90; R. 67, p. 1006.]] Carter, the general manager of All American, and Thomson, an occasional volunteer with All American, left Lorain around 12:30 p.m. in a 2007 GMC C5500 truck with a load of boxes of aluminum and copper, fifty-five-gallon drums, a metal crate filled with various parts, and three bales of aluminum cans. [[R. 1, p. 4; R. 67, pp. 1012, 1014–15.]] To reach Cleveland, they traveled eastbound along Interstate 90. [[R. 97, p. 2626.]] Out of concern for vigorous highway speed enforcement along the way, Carter set his cruise control for fifty-five miles per hour. [[R. 67, p. 1013.]]

At about 1:00 p.m., Lieutenant William Crates of the Rocky River Police Department received a phone call from DEA Special Agent James Goodwin stating that a confidential informant had notified the Lorain County Drug Task Force that a flatbed truck headed eastbound

on I-90 would be carrying narcotics within a load of aluminum cans. [[R. 66, pp. 841, 846–47.]] Crates in turn called Officer Monte Hamaoui of the Rocky River Police Department to pass along the tip. [[R. 66, p. 852.]] In a chat message he sent to Hamaoui, Crates reminded the officer that "it is a CI [confidential informant] so make your own PC [probable cause]." [[R. 66, p. 998.]] Around the same time, Goodwin's partner Sergeant Terry Helton of the DEA acted on the same tip and contacted Sergeant Timothy Timberlake and Trooper James Baker of the Ohio State Highway Patrol, notifying them that he had received information regarding a flatbed truck carrying a load of marijuana along with scrap aluminum on I-90. [[R. 68, p. 1176–77; R. 84, pp. 2265, 2267, 2269–70; R. 71-2, p. 1602–05.]]

Hamaoui drove to the Detroit Road off-ramp of I-90 and pulled over to begin watching for the flatbed truck. [[R. 64, pp. 546, 550.]] After about fifteen to twenty minutes, he saw Carter's truck travelling at what he believed to be forty-five to fifty miles per hour, ten to fifteen miles per hour below the posted speed limit of sixty miles per hour. [[R. 64, pp. 551, 561; 97, p. 2628.]] Hamaoui also alleged that the truck was weaving within its lane and between lanes as it approached. [[R. 64, pp. 571–72.]] Hamaoui drove eastbound on I-90 until he caught up with Carter and Thomson. [[R. 64, pp. 556, 567.]] Hamaoui contended in a deposition that the truck, as he followed it, continued to weave between lanes and that its tires were bulging. [[R. 64, p. 572, 585.]] The dashcam video from Hamaoui's patrol car begins about a half-mile east of the Detroit Road exit and shows him following the truck for under a mile, during which the truck does not appear to weave. [[R. 74, 13:21:05–13:21:55.]] The video also displays the approximate speed of Hamaoui's vehicle while pacing the truck, which was shown as being between fifty and fifty-three miles per hour. [[*Ibid.*; R. 64, p. 582.]]

Based on his observation of the vehicle's slow speed, alleged weaving, and bulging tires, Hamaoui pulled Carter's truck over at around 1:22 p.m. [[R. 64, pp. 586–87; R. 73, 1:21:54.]] He was almost immediately joined by Baker, who had seen Carter's truck headed eastbound while travelling west on I-90 and quickly changed direction to catch up. [[R. 68, p. 1171; R. 73, 1:19:31.]] Baker had with him Paco, a trained drug-sniffing dog. [[R. 68, p. 1182.]] Hamaoui can be seen giving Baker a thumbs-up and approaching Carter's truck on the passenger side. [[R. 73, 1:22:19.]]

Hamaoui introduced himself and asked the men where they were headed and what they did for a living. [[R. 74, 13:22:41–13:23:40.]] He also asked for a license and registration information, which Carter and Thomson provided along with Thomson's concealed-carry permit. [[R. 61, p. 300; R. 64, 592.]] Thomson was not, however, carrying a weapon on him. [[R. 61, pp. 300–01.]] Carter and Thomson stated that when Hamaoui spoke with them, he informed them that "his drug dog alerted . . . as we passed him when he was parked on the off-ramp." [[R. 67, p. 1022; R. 61, p. 301.]] Hamaoui denies saying anything about a dog detecting anything from his position. [[R. 64, pp. 630–31.]] Although the conversation between the men was recorded, the audio is at times difficult to make out. But it does not appear that Hamaoui made any mention of a drug dog alerting during his conversation. Before leaving, Hamaoui told the men to place their hands on the steering wheel and dashboard where they could be easily seen. [[R. 74, 13:24:41.]]

By this point, Officer Kim Forkins had arrived on the scene. [[R. 74, 13:24:28.]] The two officers and state trooper conferred for a short while immediately afterward. [[R. 73, 13:24:56–13:25:42.]] There is no audio of this conversation because both officers and the state trooper appear to have turned off their microphones. In testimony, however, Baker stated that

Hamaoui told him to walk Paco around the truck, [[R. 68, p. 1182.]] and Baker can be seen in the video gesturing first in the direction of his vehicle and then toward and around the truck. [[R. 73, 13:25:36–13:25:39.]]

Hamaoui returned to the passenger window and told Carter and Thomson, "[o]ne of the things that we do here, we do a drug interdiction, OK, so we're gonna run a K-9 dog around your vehicle." [[R. 74, 1:26:11.]] He asked the men to get out of the vehicle, at which point he alleges that he smelled the "faint odor of marijuana" in the cab. [[R. 64, p. 639, 691.]] Thomson walked to Forkins's car and answered brief questions about the destination of the truck. [[R. 73, 13:26:02–13:27:42.]] Thomson then was placed in Forkins's cruiser. [[R. 61, p. 328; R. 83, p. 2239.]] Hamaoui patted down Carter, removed some $10,000–$12,000 in cash Carter had in his pockets, put him into his police cruiser, and began to put Carter's money in an evidence bag. [[R. 64, p. 695; R. 67, p. 1027; R. 73, 13:26:31–13:29:02.]] During this time, Baker brought Paco to the truck and circled it. [[R. 73, 13:28:10–13:28:59.]] About a quarter of the way through the second pass, Paco alerted by scratching the passenger side of the truck near the aluminum bales. [[R. 68, p. 1204; R. 73, 13:28:58.]]

Paco has been trained and certified through the Ohio Peace Officer Training Academy as a police canine and undergoes recertification every year. [[R. 68, p. 1259.]] Baker and Paco perform canine training sixteen hours a month and are together at all times. [[R. 68, pp. 1259, 1265–66.]] At the time of the stop, the two had worked as a team for two years. [[R. 68, p. 1168.]] Paco is trained to indicate when he smells the odor of narcotics by jumping up and scratching at the area where he smells the odor. [[R. 68, p. 1307.]]. As a method of confirming that Paco was alerting to the odor of narcotics, Baker conducted a "proof out." That is, Baker moved some distance away and commanded Paco to "look here" and sniff another area of the

vehicle. [[R. 68, p. 1303; R. 73, 13:28:58–13:29:01). When Paco remained and continued to scratch at the same location, Baker knew that Paco was alerting. [[R. 68, pp. 1303–04.]]. Once Paco had positively alerted, Baker removed Paco's "reward toy," a white PVC plastic pipe that Paco associates with the smell of narcotics, from his back pocket and threw it against the side of the truck. [[R. 68, p. 1256.]]

Carter and Thomson allege that Paco alerted because Baker cued Paco by placing his reward toy on the aluminum, to which Paco then immediately alerted. [[R. 67, p. 1071.]] The video initially shows Paco scratching the truck, and then the camera's view of Baker is momentarily obscured by Hamaoui, but next Baker steps away and Paco's toy appears to come off the truck. [[R. 73, 13:28:58–13:29:01, 13:29:05.]] Thus, the video is consistent with Baker's contention and the district court's finding that Paco initially alerted without cuing, and that the reward toy was thrown against the truck by Baker. [[R. 97, p. 2632 n.4.]]

Following Paco's positive indication to the odor of narcotics, Carter was given *Miranda* warnings. [[R. 73, 13:30:29–13:30:45.]] Baker then asked if there was anything illegal in the vehicle and what Carter's plans were. [[R. 73, 13:30:45–13:32:17.]] Baker and Hamaoui searched the truck, including the cab and the area around the various barrels and boxes. [[R. 64, pp. 637–39; R. 68, p. 1224.]] No evidence of marijuana or narcotics of any kind was found. At some point while the truck was still pulled over, Trooper David Norman arrived with his K-9 partner, Storm. The two also circled the truck, but Storm did not alert to the presence of narcotics. [[R. 68, pp. 1213–14; R. 71-7, p. 2061.]]

The truck was towed to a nearby garage in Rocky River. Crates radioed Officer Jeffrey Hine and told him to meet at the Rocky River service garage to weigh a suspected overweight vehicle. [[R. 63, pp. 436–38.]]. Hine is trained on how to weigh a commercial vehicle and in

basic commercial-vehicle enforcement. [[R. 63, pp. 455–56.]] Once the truck arrived, the officers and tow-truck driver placed Carter's truck on the scales, finding that it weighed 26,100 pounds. [[R. 63, pp. 457–58.]] The officers determined that the truck was 6,600 pounds overweight and wrote a corresponding citation. [[R. 63, p. 525.]] Hine also observed in his report that there was an "obvious load induced buldge [sic] on the rear axle of the two axle truck." [[R. 91-1, p. 2539.]]

Following the weighing, officers then thoroughly searched the truck, "including all material, boxes, and drums on the truck bed . . . as well as the truck's compartments, cabin, and underneath." [[R. 97, p. 2633.]] To better access the contents of the aluminum bales, officers broke them apart and scattered the thousands of aluminum cans on the ground in order to sift through them. [[R. 64, p. 652; R. 71-7, p. 2093.]] Paco participated in the search, and Storm might have as well. [[R. 64, p. 652; R. 71-7, p. 2083.]] But no dog alerted, and no narcotics were recovered. Hine issued Carter an overweight-vehicle citation under Rocky River Ordinance 339.01 (although the citation incorrectly listed Ordinance 339.02). [[R. 63, pp. 480, 525.]] Hamaoui told Carter that he could come back to retrieve the cans that had been spread over the ground. [[R. 64, p. 704.]] Carter never came back to retrieve the cans. [[R. 67, pp. 1050–51.]]. The citation was later dismissed. [[R. 63, p. 510.]]

Carter, Thomson, and All American brought suit against Hamaoui, Baker, the City of Rocky River ("Rocky River"), and John Does 1–10 under 42 U.S.C. § 1983 for violation of their Fourth and Fourteenth Amendment rights, malicious prosecution and abuse of process by Hamaoui, intentional infliction of serious emotional distress by Hamaoui and John Does 1–10, and conversion by Rocky River. [[R. 1.]] During the pendency of the lawsuit in the district

court, the plaintiffs dropped all but the § 1983 claims against Hamaoui and Baker and the conversion claim against Rocky River.  [[R. 97, pp. 2633–34.]]

The district court granted separate motions by Baker and by Hamaoui and Rocky River for summary judgment, holding that (1) Hamaoui had reasonable suspicion that the truck was overweight due to its "bulging tires, slow speed, and large load"; (2) Paco's alert gave probable cause for officers to search the truck on the side of the highway, notwithstanding the fact that Storm did not alert; (3) Paco's alert sufficed to provide the probable cause to search the truck even after it was removed to the service garage; (4) Hamaoui and Baker did not conspire to violate the plaintiffs' constitutional rights; and (5) Rocky River was entitled to immunity on the conversion claim.  [[R. 97, pp. 2640, 2645–46, 2649–50.]]  Carter, Thomson, and All American appealed the district court's ruling with regard to their Fourth and Fourteenth Amendment claims.  [[Corrected Appellant Br. 1–2.]]

## II

Qualified immunity is immunity from suit provided to government officials performing discretionary functions where "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Thus, we look to preexisting law and whether any unlawfulness of the actions in question was apparent. *Id.* at 640.  Here, the question is whether Hamaoui and Baker violated the Fourth Amendment, which preserves the right of the people to be free from unreasonable searches and seizures.

### A.  The Initial Traffic Stop

We turn first to Hamaoui's stop of Carter and Thomson.  The law requires at least reasonable suspicion of criminal activity or an *ongoing* misdemeanor in order to effect a traffic

stop. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008). Here, our inquiry is whether it would have been clear to a reasonable officer that he lacked lawful authority to stop Carter. Hamaoui provided three reasons that he pulled Carter over: his low speed, his weaving, and the suspected overweight load on the truck. [[R. 64, p. 587.]] The district court addressed only the overweight load of the truck in finding that reasonable suspicion existed, determining that Hamaoui could reasonably suspect that the truck was overweight "given the large load that plaintiffs were carrying, the truck's slow speed, and the bulging tires." [[R. 97, p. 2642.]] A violation of Rocky River Ordinance 339.01, which prohibits operating overweight vehicles on state routes within the municipality (defined by Ohio Rev. Code §§ 5577.01–.09), is a misdemeanor that is necessarily ongoing when the vehicle is pulled over on a state route. Thus, the standard of reasonable suspicion applies. In determining whether reasonable suspicion existed, we "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Garrido*, 467 F.3d 971, 981 (6th Cir. 2006) (quoting *Arvizu*, 534 U.S. at 273). "[T]he totality of the circumstances approach allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Ibid.* (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002)).

Previous cases involving weight enforcement have involved officers experienced in these matters. *See, e.g.*, *Reid Mach. Inc. v. Lanzer*, 421 F. App'x 497, 502 (6th Cir. 2010) ("[D]eputies, *experienced in weight enforcement*, observed the truck impeding traffic and observed that it had a visible load, bulging tires, and sluggish movement." (emphasis added)) (citing *Brierley v. Schoenfeld*, 781 F.2d 838, 841 (10th Cir. 1986) (concluding that the officer,

experienced in truck enforcement, had reasonable suspicion that the truck was overweight "based upon his observation of the squatty rear-axle tires")); *cf. United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) ("*Due to the officers' familiarity with window tinting* and their estimate that the vehicle was tinted substantially darker than permitted by law, we agree with the district court's determination that the officers had a proper basis to initiate the traffic stop." (emphasis added)). But Hamaoui admitted that he had never been trained on overweight-truck enforcement. [[R. 64, p. 583.]] Although he had cited trucks for weight violations in the past, those citations merely required running a truck's plate number and checking on a police database whether the truck's maximum gross weight exceeded three tons and therefore was over the weight limit of a bridge, not individual judgments on the weight of the truck. [[R. 64, p. 690.]] And he admitted that it "was hard to speculate at what the gross weight was and what its legal [maximum] weight was." [[R. 64, p. 688.]]

Experience or training can matter in these cases. *See Brierley*, 781 F.2d at 841 ("The experience of the officer is a factor to be carefully considered in determining whether an investigatory stop is justified."). Part of the reason for the deference enunciated in previous Supreme Court cases is the ability of officers to use their experience and training to form inferences and deductions that "might well elude an untrained person." *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Any special deference to the experience of a police officer must be limited in this case, where the officer admitted that he had no training or experience in this matter. Although the Supreme Court has been exceedingly clear that Fourth Amendment cases are evaluated as much as possible from an objective standpoint, *see, e.g.*, *Whren v. United States*, 517 U.S. 806, 812–13 (1996), it has also noted that the facts observed by officers are relevant, *see Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether

probable cause exists depends upon the reasonable conclusion to be drawn from the facts *known to the arresting officer at the time of the arrest*. (emphasis added)). It follows, then, that where an officer lacks experience and training, we must evaluate the facts with less than the deference accorded in cases where an officer was trained in such matters. This shift is necessary lest we defer blindly in the expectation that a trained officer would have made inferences that no trained officer in fact either drew or testified could have been drawn[1] and that we are ill-equipped to make.[2]

Notably, Hamaoui also did not know the legal maximum weight of the vehicle or the elements of the law that he used to pull over Carter. The district court remarked that "it would be unreasonable to require an officer to know how much a vehicle is lawfully required to weigh before he could pull it over for suspicion of being overweight." [[R. 97, p. 2642.]] Admittedly, Ohio's overweight-vehicle law is quite complex.[3] It is important, however, for officers to know the maximum in question precisely because the limit varies by vehicle, depending on a number of variables including tire size, distance between axles, and make of the car. Thus, reasonable

---

[1] Hine's statement that the truck's tire bulge, slow speed, and weaving indicated to him that the truck was overweight is unhelpful, given that he also noted that he did not know the speed the truck was travelling and had not observed the alleged weaving. [[R. 63, pp. 465–68, 496–98.]] Inferences drawn from the testimony of other experienced officers may be helpful when based on the same data, but not when based on hypothetical situations that might not describe the actual facts.

[2] Such withholding of some deference is still consistent with *Devenpeck*'s admonition to avoid creating distinctions between "[a]n arrest made by a knowledgeable, veteran officer . . . [and] an arrest made by a rookie *in precisely the same circumstances*." 543 U.S. at 154. Because experience provides an officer with greater insight into the data observed, the circumstances are not the same with a trained and untrained observer because the facts in play are different despite the same scene. This is the source and summation of the reason behind deference to experienced officers in the first place. *Devenpeck* involved two officers with the same information available to them.

[3] Ohio's maximum-weight law is based in part on a formula found in Ohio Rev. Code § 5577.04(C), "$W=500((LN/N-1)+12N+36)$," which uses as its variables (1) $L$, the "distance . . . between the extreme of any group of two or more consecutive axles," (2) $N$, "the number of axles in the group under consideration," and (3) $W$, the "overall gross weight on any group of two or more consecutive axles." Although the Ohio Final Bill Analysis reported that the legislation used the federal bridge formula ("$W=500((LN/(N-1))+12N+36)$"), Ohio Bill Analysis, 2001 H.B. 73; *see also* 23 U.S.C. § 127, the arithmetic as stated in the Ohio code works out differently. *See* Ron Larson with Kimberly Nolting, *Elementary and Intermediate Algebra* 48 (5th ed. 2010) (explaining that the order of operations requires multiplication and division within parentheses to be performed before addition or subtraction).

suspicion that a particular truck is overloaded will depend upon the type of vehicle: a large load on a pickup truck might indicate that the truck is overweight when the same load on a flatbed eighteen-wheeler would not. Nevertheless, reasonable suspicion is an objective concept that applies regardless of whether the officer had those facts in mind: the question is whether reasonable suspicion existed based on the facts observable to the officer, even if the officer in question is unaware of the basis for that suspicion. *See Devenpeck*, 543 U.S. at 154.

Accordingly, here it does not matter that Hamaoui did not have the state of mind to justify the action; we must examine objectively the facts he observed and determine whether they are sufficient to provide reasonable suspicion of a violation of the laws. It is worth emphasizing that we are obliged to perform this objective analysis despite the officer *not knowing the substance of the law to be applied*—indeed, neither Hamaoui nor Rocky River was able to enunciate how Carter could have broken the law even at oral argument,[4]—because binding precedent requires an objective view of the evidence and law.

Examining then those facts observed by Hamaoui, we cannot hold that there was reasonable suspicion of a violation of Ohio's overweight-vehicle law. The facts[5] are as follows: The video demonstrates that Carter's truck was likely moving between fifty and fifty-five miles per hour along the highway in the rightmost lane of traffic on a three-lane stretch of I-90. [[R. 74, 13:21:05–13:21:57.]] It also shows that the truck was carrying a large load of various materials. Finally, the appellants admitted (in Carter's deposition) that the tires might have appeared to have "a little bulge to 'em" [[R. 67, p. 1085.]], which they state exists in radial tires

---

[4] Although the Appellees have repeatedly stated as a matter of fact that the truck could not legally weigh over 19,500 pounds, [[*e.g.*, R. 91-1, p. 2539]] they do not provide the factual predicates or explanation as to how they arrived at the conclusion, other than stating that they looked up the "maximum allowable gross weight" of the truck. [[R. 63, p. 457; 91-1, p. 2539.]] We cannot find this term as a measurement for a truck being overweight in the relevant sections of Ohio law. *See* Ohio Rev. Code §§ 4513.01–.37, 5577.01–.09.

[5] We rely on solely those facts that are uncontested or indisputable based on video evidence. *See Oliver v. Greene*, 613 F. App'x 455, 457 (6th Cir. 2015).

-12-

regardless of any weight on the truck (as opposed to bias-ply tires, which would normally bulge only as a result of the weight of carried objects).  [[R. 67, p. 1085.]]

There are a few ways that a vehicle might be overweight on an Ohio interstate highway. First, the maximum weight cannot exceed the total of 650 multiplied by the number of inches of total width of all tires of the vehicle where those tires are six inches or greater in width.  Ohio Rev. Code § 5577.03.  (For tires of smaller widths, the multiplier diminishes.)  Hine observed in his deposition that the truck had a dual rear axle, meaning that it had two tires on each side (and therefore the truck had a minimum of six tires).  [[R. 63, p. 460.]]  There is no evidence of the size of the tires on the truck other than their appearance on the video, or that Hamaoui considered the size or number of tires at all (other than their alleged bulge).[6]  A speed some seven miles per hour below the maximum speed limit coupled with a potential bulge on a tire does not correspond to a violation of this law: although a bulge could provide some indication with regard to weight, there is no proffered evidence that demonstrates that bulges appear when a weight greater than 650 pounds per inch of tire width is placed upon them.

Rather, the evidence demonstrates that on some tires (like those on Carter's truck), bulges appear regardless of weight.  Nor is there evidence that, in the officer's experience, such bulges correlated with a violation of Ohio law.  *See Brierley*, 781 F.2d at 840 (observing as a factor in the totality of the circumstances the officer's experience that "about fifty percent of the trucks he had stopped with 'squatty' tires were overweight" under Utah law).  Thus, there is at best a weak correlation between the bulge and the weight.  Similarly, overweight trucks often travel at slower speeds, but so do trucks travelling through notorious speed traps.  Again, Hamaoui can show a weak correlation at best.  And finally, Carter was carrying a large load of scrap metal.  Here,

---

[6] We thus note that even with the benefit of hindsight, this court is unable to determine what weight would have been the truck's maximum under this section of Ohio law.  If the tires were only six inches in width, then the maximum would have been 23,400 lbs.

however, we have the benefit of a trained officer who had observed the same truckload as Hamaoui. Hine, who had seen the truck at the garage, admitted that "the freight that Mr. Carter had on his truck . . . [did not suggest] the truck [was] overweight." [[R. 63, p. 504.]] And while overweight trucks often have large loads, so too do trucks well within legal limits. Of course, conduct that is consistent with innocent behavior can also provide reasonable suspicion, *see United States v. Sokolow*, 490 U.S. 1, 9 (1989), but there must be "concrete reasons for such an interpretation." *United States v. Smith*, 263 F.3d 571, 594 (6th Cir. 2001) (citation omitted); *cf. Sokolow*, 490 U.S. at 10 ("A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to th[e] conclusion [that a person's behavior was consistent with drug smuggling] . . . ."). We must consider the law objectively: if the facts form the dots, an individual officer need not have connected them himself so long as a reasonable officer could have connected them to form reasonable suspicion. But the officer cannot simply turn the pen over to the court and hope for the best. Considering the totality of the circumstances of the slight bulge in the tire, the fifty to fifty-five mile-per-hour speed, and the load of scrap metal on a flatbed truck with a minimum of six tires, Hamaoui had no reasonable suspicion of a violation of Ohio Rev. Code § 5577.03.

Turning next to the weight formula found in § 5577.04(C), the police never measured the length between the truck's axles, but Hamaoui observed that it was a two-axle truck. [[R. 63, p. 448; R. 64, p. 689.]] Using the formula, it is impossible to arrive at the officers' purported maximum legal weight of 19,500 lbs unless the distance between the axles were a negative number.[7] Moreover, the bulging tires and slow speed of the truck are insufficient to constitute reasonable suspicion for the reasons stated above with regard to Ohio Rev. Code § 5577.03.

---

[7] If $W=500(LN/N-1+12N+36)$, then if the maximum weight is 19,500: $19,500=500(L-1+24+36)$. $39=L+24+35$. $L=-20$. Using the actual federal bridge formula of $W=500(LN/(N-1)+12N+36)$, the formula similarly produces a

It would appear that the number actually now used to justify Hamaoui's suspicion that the truck was overweight was the manufacturer's gross vehicle weight rating (GVWR). As observed in footnote four above, there is no indication that exceeding the GVWR is itself a violation of Ohio law if the truck is in fact under the state's weight limits. Thus, the inability of Hamaoui to identify the weight is magnified by the fact that the numbers later used to justify the issuance of a citation were based on a nonexistent statute. Reasonable suspicion must be tied to a violation of existing laws, and any error of law in determining that suspicion must also be "reasonable." *See Heien v. North Carolina*, 135 S. Ct. 530, 539 (2014). But the error of law here is not reasonable because there is no logical connection between the law that the Rocky River officers contended they were applying and the law actually on the books. The same factors involved in § 5577.03 apply here: the bulge and slow speed are at best indicative of some weight on the truck, but not necessarily that it exceeded Ohio's legal weight limit. And indeed, the numbers here were not even close: assuming the axles were five feet apart (and Hine asserted that they were "more than five feet" apart [[R. 63, p. 448]]), the maximum weight under § 5577.03 would have been 32,000 lbs, nearly three tons more than Carter's truck actually weighed.[8] Again, considering the totality of the circumstances, there was no reasonable suspicion of a violation of Ohio Rev. Code § 5577.04(C). Without a demonstration that Hamaoui had any experience in weight enforcement or that the facts he observed were actually more likely to demonstrate a violation, we cannot find that reasonable suspicion existed for an overweight violation.

---

negative result: $19,500=500(2L/1+24+36)$. $39=2L+60$. $L=-10.5$. (As a reminder, $L$ is the distance between the extreme of any group of two or more consecutive axles, $N$ is the number of axles in the group, and $W$ is the overall gross weight on any group of two or more consecutive axles.) If $L$ is a positive number, the weight limit must be over 29,500 lbs, as discussed in more detail below.

[8] Under the federal bridge formula, the maximum weight would have been 35,000 lbs, nearly 10,000 lbs more than Carter's 26,100-pound truck.

Arriving then at Hamaoui's other two reasons for pulling over Carter and Thomson, it is clear that a genuine issue of material fact remains. Hamaoui claims that Carter was weaving both within his lane and between lanes and that he was moving too slowly. The first allegation might show a violation of Ohio Rev. Code §§ 4511.33 and 4511.39 and the second might show a violation of Ohio Rev. Code § 4511.22(A). Carter and Thomson, however, dispute these allegations, claiming that they were driving on cruise control at fifty-five miles per hour and not weaving. [[R. 67, pp. 1013, 1019.]] The video demonstrates that their speed was likely between fifty and fifty-three miles per hour for the period recorded and does not show any weaving of the truck. Hamaoui now claims that the weaving and slow speeds of approximately forty-five miles per hour occurred before his dashcam began recording, but because all reasonable inferences are drawn in Appellants' favor, we must use those facts as plausibly alleged. With regard to the alleged weaving, under Carter's description, there was no weaving of the truck. Absent such weaving, there can be no reasonable suspicion that the truck was violating Ohio's law mandating maintenance of a vehicle in its lane. *See* Ohio Rev. Code §§ 4511.33, 4511.39. With regard to the speed, Ohio's law prohibits driving "at such an unreasonably slow speed as to impede or block the normal and reasonable movement of traffic." Ohio Rev. Code § 4511.22(A). The video does not appear to show traffic on the three-lane interstate being impeded by Carter's truck in the rightmost lane. Therefore, there remains a question of material fact over whether there was reasonable suspicion based on the truck's movements before the video. Accordingly, Hamaoui did not have reasonable suspicion to pull over Carter's truck on the three bases he enumerated with respect to the observable conduct on the video.

Appellees argue that, even if Hamaoui's reasons are insufficient, the anonymous tip should be enough to provide the requisite reasonable suspicion to pull over Carter and Thomson.

But the tip was insufficient in and of itself to provide reasonable suspicion, a fact acknowledged by Crates and Hamaoui in their chat messages. (Crates, 1:06:21 p.m.: "Remember it is a CI so make your own PC." Hamaoui, 1:07:50 p.m. "10-4.") [[R. 66, p. 998.]] The information provided by the tipster, that there was a black flatbed truck headed eastbound on I-90 that was loaded with soda cans and bags of marijuana [[R. 66, p. 998.]], is insufficient because it merely described "a condition presumably existing at the time of the call." *Alabama v. White*, 496 U.S. 325, 332 (1990). "An accurate description of a subject's readily observable location and appearance . . . does not show that the tipster has knowledge of concealed criminal activity." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). And the Supreme Court's recent decision in *Navarette v. California*, 134 S. Ct. 1683 (2014), is not to the contrary. In *Navarette*, there was a contemporaneous eyewitness call through the traceable 911 call system, which supported the veracity of the caller. *Id.* at 1688–89. Here, there was no indication of who made the tip and no indication that the tipster had personally seen the marijuana in the truck. As a result, the tip was insufficient to provide reasonable suspicion of criminal activity.

Merely demonstrating that an officer's actions violate the Fourth Amendment is insufficient to defeat qualified immunity; instead, the violation must be unreasonable in light of clearly established law. We must use caution to avoid defining "clearly established law" at too-high of a level of generality. *See Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011). Of course, prior case law need not be "directly on point, but existing precedent must have placed the . . . question beyond debate." *Id.* at 741.

It has been clear since *Terry v. Ohio* that hunches, even in good faith, that the law is being broken, are not enough to provide reasonable suspicion of criminal activity sufficient to effect a stop. 392 U.S. 1, 21 (1968). And it has been further made clear that officers may not

stop vehicles without reasonable suspicion of an ongoing traffic violation. *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008). In the one—unpublished—opinion in the Sixth Circuit to address similar facts, *Reid Machinery Inc. v. Lanzer*, 421 F. App'x 497 (6th Cir. 2010), we observed that where "deputies, experienced in weight enforcement, observed [a] truck impeding traffic and observed that it had a visible load, bulging tires, and sluggish movement," reasonable suspicion existed. *Id.* at 502. Of these five factors (experienced officers, impeded traffic, visible load, bulging tires, and sluggish movement), Hamaoui can point to two at best— bulging tires and a visible load[9]—and Hine's observation vitiates the reasonability of the suspicion based on the load. Given that Hamaoui could not demonstrate how the bulging tires could correspond to a particular violation, the case does not fall within *Reid Machinery*'s safe harbor. The facts observed, without greater clarification demonstrating why they show a likelihood of violation of law, were not sufficient. Some "stronger indicator[] of [violative] conduct" in addition to what Hamaoui observed was required. *United States v. Townsend*, 305 F.3d 537, 545 (6th Cir. 2002). It is also clearly established that the anonymous tip was insufficient to demonstrate reasonable suspicion to pull Carter over. *See, e.g.*, *Srisavath v. City of Brentwood*, 243 F. App'x 909, 915, 918 (6th Cir. 2007).

To define the level of generality as the district court did goes too far. The district court concluded that case law must hold that "an officer *must* have [commercial-weight-enforcement] training before he or she can stop a vehicle on suspicion of being overweight" [[R 97, p. 2647]] in order for a defendant to lose the protection of qualified immunity. First, the statement itself is too broad; an officer may reasonably stop a vehicle on suspicion of being overweight when he can identify facts that reasonably correspond to a violation of the laws or a suggestion that

---

[9] Although travel on the interstate at fifty-three miles per hour might be described as "slow," it is hardly "sluggish."

criminal activity is afoot regardless of whether he has been trained. What we note today is that a reasonable officer should be aware that he must have articulable facts that demonstrate an ongoing violation of traffic laws in order to bring about a stop, and that driving at a reasonable speed with a normal load and tires that appear to bulge—without something more, be it training or experience, that provides further information or inference—does not provide reasonable suspicion of an overweight vehicle under Ohio law. To require more specificity in our precedent would frustrate the very nature of a totality-of-the-circumstances test, which inherently takes into account all of the facts and will invariably differ from case to case. In previous cases involving reasonable-suspicion stops, we have noted that where the premises of cases clearly apply to the facts at hand, "a reasonable officer would have been aware of the relevant rights." *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003). Hamaoui has failed to demonstrate anything more than a tenuous connection between the facts he observed and the alleged violation. This failure, in conjunction with the insufficiency of the anonymous tip to provide adequate independent cause to pull over the truck, means that a genuine issue of material fact exists as to whether Hamaoui violated clearly established law.

It is not that every officer must have had experience or training in a particular crime, or be able to cite the code chapter and verse—far from it. But in the complex situation of commercial weight limits, which vary by vehicle, to say that any officer can look at a truck without knowing how much it should weigh or generally the limitations on its weight and still pull it over based on observations applicable to any commercial truck is to "invite intrusions upon constitutionally guaranteed rights." *Terry*, 392 U.S. at 22. Therefore, we reverse the district court's grant of summary judgment to Hamaoui on the basis of qualified immunity with respect to Hamaoui's initial stop.

### B. The Dog Sniffs and Roadside Search of the Truck

We analyze the subsequent allegations of Fourth Amendment violations "separately for each search or seizure that is alleged to be unconstitutional." *County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017). Accordingly, if the searches are "reasonable, taking into account all relevant circumstances," the claims will fail. *Ibid.*

### 1. Initial detention during Paco's sniffing

Hamaoui took several actions more consistent with a desire to seek out marijuana than to perform an overweight-vehicle inspection. After speaking with Carter and Thomson, Hamaoui returned to Baker and told him to walk Paco around the truck. [[R. 68, p. 1182.]] He returned to the passenger window and told Carter and Thomson, "One of the things that we do here, we do a drug interdiction, OK, so we're gonna run a K-9 dog around your vehicle." [[R. 74, 1:26:11.]] He asked them to get out of the vehicle, patted down Carter, put him into his police car, and began to put Carter's money in an evidence bag. He then stood on the side of the highway waiting for Baker and Paco to complete their walk around the truck. [[R. 73, 1:29:40.]] The Supreme Court has stated that the prolonging of a stop to conduct a dog sniff without reasonable suspicion violates the Fourth Amendment. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015). But here there is no evidence that Hamaoui's action prolonged the stop; he patted down Carter and put him in the police car and began putting Carter's possessions in a bag when Paco alerted. And Hamaoui was permitted to order the men out of the truck. *See Arizona v. Johnson*, 555 U.S. 323, 331 (2009) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures.") As a result, this detention of Carter and Thomson was lawful.

2. Probable cause

Appellants argue that the police lacked probable cause to search the truck on the side of the highway because (1) Baker cued Paco to alert, and (2) Paco alerted only on his second circling of the truck and Storm did not alert at all to the truck. With regard to Baker's alleged priming of Paco with the reward toy, the video demonstrates (as the district court also noted) that Paco alerted before Baker removed the toy and that the toy appeared only after Paco had alerted. As a result, we need not accept Appellants' contention that Baker placed the toy on the truck before Paco alerted. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Turning then to the question of the dog that did not bark (or, rather, alert), Storm, and the fact that Paco alerted only on his second go-round of the truck, we find that probable cause still existed. First, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013). Paco is certified and, as a result, his alert provides an initial basis for probable cause to search. Nor does the delay in the alert or the failure of a subsequent dog to alert dissipate the probable cause. In *United States v. Perez*, 440 F.3d 363 (6th Cir. 2006), the failure of a drug-sniffing dog to alert to a vehicle did not negate probable cause derived from an alert of a different dog an hour later. *Id.* at 374–75. Therefore, the alert was sufficient to provide probable cause for officers to search the truck on the highway.

## C. The Subsequent Search at the Garage

Finally, Appellants argue that the subsequent search at the garage was in violation of the Fourth Amendment on the basis of the limits of the automobile exception. But once the police had probable cause to search the truck, they also had probable cause to move the truck to a

location where they could properly and safely search through it. The Supreme Court has stated that it is appropriate to afford "deference to police caretaking procedures designed to secure and protect vehicles and their contents within police custody." *Colorado v. Bertine*, 479 U.S. 367, 372 (1987). In *Texas v. White*, 423 U.S. 67 (1975), the Supreme Court held that there was probable cause to search a car that had been pulled over and then driven by an officer to the station house. "There, as here, '(t)he probable-cause factor' that developed at the scene 'still obtained at the station house.'" *Id.* at 68 (per curiam).

Appellants' argument to the contrary regarding the automobile exception is unavailing. Although the vehicle no longer threatened to leave its position, no warrant was necessary. *See United States v. Graham*, 275 F.3d 490, 510 (6th Cir. 2001) (holding that the Supreme Court intended "to show that when the place to be searched, such as a truck, is associated with a lesser expectation of privacy than a home, the justification for a warrantless search articulated in *Carney* is satisfied provided the police have probable cause"). Because probable cause was demonstrated, the ensuing search at the garage was appropriate.

III

Ultimately, Hamaoui's arguments and explanations for the reasonableness of his traffic stop are subject to genuine disputes of material fact. He is therefore not entitled to qualified immunity as a matter of law. We thus **REVERSE** the district court's grant of qualified immunity with respect to Hamaoui. Because there was probable cause for the ensuing searches, however, we **AFFIRM** the district court's grant of qualified immunity with respect to Baker. We remand for further proceedings consistent with this opinion.