NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0178n.06

No. 19-3163

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Mar 27, 2020<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| MICHAEL BETTS, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: STRANCH, READLER, and MURPHY, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** A police dog alerted officers to the presence of contraband in Michael Betts's vehicle. An ensuing search uncovered drugs, a firearm, and a loaded magazine. Following his indictment for drug and firearm crimes, Betts sought to suppress the evidence discovered in his vehicle, contending that the officers violated his Fourth Amendment rights by prolonging a routine *Terry* stop for a drug dog to arrive. But the surrounding circumstances of the encounter gave the officers reason to prolong the stop, and the police dog arrived before the officers completed the purpose of the stop. Accordingly, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Michael Betts drove his vehicle to a commercial parking lot in Salem, Ohio, early one November morning. Curious behavior marked the occasion. Betts was in the parking lot at roughly 1 a.m., when all the adjacent businesses were closed. Betts parked his vehicle in front of

a shop that had been frequently burglarized. Betts's vehicle blocked the shop's drive-through window. And Betts paced around his vehicle, despite chilly middle-of-the-night November temperatures.

After viewing this episode for more than half an hour, a witness called the police, identified himself, and explained what he had seen. Officer Donald Paulin and another officer were dispatched to the scene. When they arrived, Paulin pulled behind Betts's vehicle, turned on his emergency lights, and ran a check of Betts's license plate. Within two minutes, Paulin learned that the plate was invalid. Paulin also knew that the shop Betts was parked in front of had been frequently burglarized through the drive-through window Betts was now blocking.

Upon seeing the emergency police lights, Betts re-entered his vehicle. Paulin approached the vehicle and ordered Betts out. As they spoke, Betts was "sweating profusely" (despite the frigid temperatures) and "talking a lot." Betts stated that he had driven to the parking lot to get a drink from a nearby vending machine, yet he reportedly had been in the lot for over thirty minutes, pacing around the vehicle. Betts added that he was looking for an address on Arch Street. But the address Betts provided did not exist on Arch Street in Salem—the Arch Street address Betts was looking for, Paulin knew, was an established drug area in neighboring Alliance. At this point, the officers on the scene called for a police dog.

Roughly five minutes after this call, and within eleven minutes of the initial stop, Officer Michael Garber arrived with his police dog, Simon. Garber took Simon for a first pass around Betts's vehicle. As they passed the trunk, Simon snapped his head and increased his sniffing intensity, an alert behavior to the presence of contraband. During a second pass, Simon again exhibited alert behavior to the presence of contraband near the trunk.

2

Because neither Betts nor anyone else could legally drive the vehicle due to its invalid license plate, and because the vehicle was blocking a drive-through window, the officers informed Betts that the vehicle needed to be towed. Paulin in turn agreed to Betts's request that Betts be allowed to call a tow truck himself to have the vehicle towed to a friend's house. Betts then spoke on his cell phone, but he did not call for a truck. By this point, the police dog had exhibited alert behavior to the presence of contraband. The officers asked Betts if they could search his vehicle. Betts refused. After calling the local prosecutor for legal guidance, the officers searched the vehicle without Betts's consent. They found marijuana, crack cocaine, heroin, multiple cell phones, a firearm, and a loaded magazine.

Following his ensuing indictment for possession with intent to distribute and felon in possession of a firearm charges, Betts moved to suppress the evidence found in his vehicle on Fourth Amendment grounds. The district court denied Betts's motion to suppress, and a jury convicted Betts. Betts now appeals the district court's denial of his motion to suppress.

## II.   ANALYSIS

"When reviewing [a] district court's ruling on a motion to suppress, we review findings of fact for clear error and legal conclusions de novo." *United States v. Jackson*, 682 F.3d 448, 452 (6th Cir. 2012) (citing *United States v. Tackett*, 486 F.3d 230, 232 (6th Cir. 2007)).

*Fourth Amendment Jurisprudence.* In recognition of Betts's Fourth Amendment right to a "reasonable expectation of privacy," before a police officer could search Betts or his vehicle, the officer ordinarily would need to obtain a warrant. *See Taylor v. City of Saginaw*, 922 F.3d 328, 332–34 (6th Cir. 2019). Paulin, however, did not have a warrant to search Betts or his vehicle. Today's case thus turns on the applicability of any exceptions to the warrant requirement.

3

One is the *Terry* exception. *See United States v. Wilson*, 506 F.3d 488, 494 (6th Cir. 2007). Under the *Terry* doctrine, a police officer who has "reasonable suspicion" that criminal activity is ongoing or about to occur may stop an individual to investigate. *See Family Serv. Ass'n ex rel. Coil v. Wells Township*, 783 F.3d 600, 604 (6th Cir. 2015). *Terry* stops, though, are limited in both duration and scope. The duration is limited to the length of time necessary to investigate the underlying reason for the stop. *United States v. Stepp*, 680 F.3d 651, 661–62 (6th Cir. 2012) ("When the initial traffic stop has concluded . . . any subsequent prolonging, even de minimis, is an unreasonable extension of an otherwise lawful stop." (citing *United States v. Everett*, 601 F.3d 484, 492 n.9 (6th Cir. 2010))). And the scope is limited to the original purpose of the stop. *Id.* at 661 (noting that, absent additional reasonable suspicion, "all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference'" (quoting *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002))). A routine traffic stop, for example, would not provide probable cause to justify searching a vehicle for drugs, absent additional considerations.

One additional consideration is whether the police have probable cause that the vehicle contains evidence of criminal activity. *United States v. Graham*, 275 F.3d 490, 509 (6th Cir. 2001). A common way to discern evidence of criminal activity is through the nose of a trained canine, also known as a "dog sniff." *See Carter v. Hamaoui*, 699 F. App'x 519, 532–33 (6th Cir. 2017) (citing *Florida v. Harris*, 568 U.S. 237, 247 (2013)). Because there is no expectation of privacy in contraband, a routine dog sniff to detect contraband is generally not, by itself, a "search" for Fourth Amendment purposes. *Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005). Where a sniff takes place before completion of the stop's purpose, the indication of contraband would justify a search of the vehicle. But where a stop is extended for the sole purpose of performing a dog sniff,

an ensuing vehicle search would be in tension with the duration and scope limitations on *Terry* stops, and thus unlawful under the Fourth Amendment. *Rodriguez v. United States*, 575 U.S. 348, 357 (2015) ("As we said in *Caballes* and reiterate today, a traffic stop 'prolonged beyond' that point is 'unlawful.' The critical question . . . [is] whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'" (quoting *Caballes*, 543 U.S. at 407 (citation omitted))); *see also Hernandez v. Boles*, 949 F.3d 251, 256 (6th Cir. 2020).

*Application of the Fourth Amendment.* Applying these principles to the search of Betts's vehicle, we examine each step of the incident to determine whether any of the officers' actions violated the Fourth Amendment. *See Hamaoui*, 699 F. App'x at 532. We "[b]egin at the beginning." Lewis Carroll, *Alice's Adventures in Wonderland & Through the Looking-Glass* 121 (Annotated Ed. 2000). Paulin testified that, from the moment he arrived on scene, Betts was not free to leave. That constitutes a seizure—a reasonable person in Betts's shoes would not have felt free to leave the scene. *See United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007).

Was the seizure justified? Under *Terry*, Paulin must have had reasonable suspicion that criminal activity was either ongoing or about to occur. In assessing whether the circumstances in question support a finding of reasonable suspicion, we do not employ "a high bar"; an "officer needs only 'a minimal level of objective justification' for the stop considering the 'whole picture' around him." *United States v. Coker*, 648 F. App'x 541, 544 (6th Cir. 2016) (citing *Navarette v. California*, 572 U.S. 393, 396–97 (2014) and quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 127 (2000)). And in close calls, we "review the evidence 'in the light most likely to support the district court's decision.'" *United States v. Winters*, 782 F.3d 289, 301 (6th Cir. 2015) (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994)).

5

1. An identified tipster provided many indicators establishing reasonable suspicion to detain Betts. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) (noting that non-anonymous tips are more reliable than anonymous tips when considering reasonable suspicion). One, Betts was in the parking lot late at night. *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (noting that late-night activity in a high-crime area is a contextual consideration relevant to the reasonable suspicion calculus) (abrogated on other grounds). Two, the surrounding businesses were closed. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) (noting that officers can "consider the characteristics of the area in which they encounter a vehicle" for reasonable suspicion purposes). Three, Betts's vehicle was in the exact place where prior burglaries occurred. *United States v. Johnson*, 267 F. App'x 412, 414 (6th Cir. 2008) (finding that a vehicle routinely parked at a known drug house was likely to contain individuals associated with drug trafficking thus contributing to reasonable suspicion). Four, Betts was at the location for over thirty minutes. *United States v. Craig*, 306 F. App'x 256, 257, 262 (6th Cir. 2009) (finding reasonable suspicion to justify an investigatory stop based in part on an informant's observation of unusual loitering in a parking lot). And five, Betts was pacing outside on a cold night. *United States v. Bridges*, 626 F. App'x 620, 624–25 (6th Cir. 2015) (noting that the defendants were sitting in a vehicle in the cold temperature when considering reasonable suspicion). Taken together, these indicators easily surpassed the "minimal level of objective justification" for Paulin reasonably to suspect criminal activity, and thus reasonable suspicion to conduct an investigatory stop. *Coker*, 648 F. App'x at 544 (quoting *Wardlow*, 528 U.S. at 123).

With the investigatory stop underway, Paulin immediately discovered criminal activity. A record check revealed that Betts's license plate was invalid. Betts also lacked a valid driver's license. As Betts was the only one at the scene, it was reasonable to assume he drove the vehicle

6

to this location. Paulin thus had probable cause to believe that Betts had committed a crime. Equally true, because the vehicle could not legally be driven, it needed to be towed. Paulin's *Terry*-based seizure was thus justified in continuing until a tow truck arrived. *See Rodriguez*, 575 U.S. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

That is when the drug dog arrived—after the beginning of the *Terry* stop and investigation, but before the tow truck's arrival. The officers, in other words, did not prolong the duration of the stop for a dog to arrive. Rather, the dog arrived during the permissible time and scope of the *Terry* stop, while Paulin awaited a tow truck. That sequencing does not run afoul of the Fourth Amendment.

2. Just as the period of time Betts was detained did not run afoul of the Fourth Amendment, nor did the subsequent search of his vehicle. To conduct a search of a vehicle, law enforcement officers do not need a warrant—they need only probable cause that the vehicle contains evidence of criminal activity. *Taylor*, 922 F.3d at 334 (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)). When a well-trained drug dog indicates the presence of contraband in a vehicle, police have probable cause to search the vehicle. *Hamaoui*, 699 F. App'x at 533 (citing *Harris*, 568 U.S. at 246–47). The facts here satisfy both threshold requirements. Simon, the police dog, exhibited at least two alert behaviors indicating that the vehicle contained contraband. And Betts, in his briefing, does not challenge Simon's training pedigree. Accordingly, no Fourth Amendment violation occurred.

## CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.